UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

EARL JAMES RAY,

        Plaintiff,

v.                                Case No. 3:23-cv-365-BJD-MCR

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

        Defendants.

_____

### ORDER OF DISMISSAL WITHOUT PREJUDICE

## I.    Status

Plaintiff, Earl James Ray, an inmate of the Florida penal system, initiated this action *pro se* by filing a complaint for the violation of civil rights under 42 U.S.C. § 1983 (Doc. 1; Compl.), along with exhibits (Docs. 1-1 through 1-5; Compl. Exs. A-E), a motion to proceed *in forma pauperis* (Doc. 2), and a motion to appoint counsel (Doc. 3). Plaintiff names three Defendants for their alleged deliberate indifference to his serious medical needs: Ricky Dixon, the Secretary of the Florida Department of Corrections (FDC); Centurion of Florida, LLC, a company under contract with the FDC to provide medical care for inmates; and Dr. Anthony Massaro, an oral surgeon who performed surgery on Plaintiff on April 9, 2019. *See* Compl. at 2-3, 5. Plaintiff alleges Dr. Massaro "severed numerous nerves on the left side of [his] tongue" during a molar

extraction, which has caused chronic numbness and pain. *Id.* at 5. He contends he has permanent nerve damage, and treatment for the issue was denied or delayed due to policies, practices, or customs of "unnecessarily delaying or denying proper and timely treatment to inmates." *Id.* at 4, 6.

## II.   Standard of Review

The Prison Litigation Reform Act (PLRA) requires a district court to dismiss a complaint if the court determines it is frivolous, malicious, or fails to state a claim on which relief may be granted. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b)(1). Since the PLRA's "failure-to-state-a-claim" language mirrors the language of Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts apply the same standard in both contexts. *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997). *See also Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Labels and conclusions" or "a formulaic recitation of the elements of a cause of action" that amount to "naked assertions" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 555). Moreover, a complaint must "contain either direct or inferential allegations respecting all

the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir. Unit A Sept. 8, 1981)). In reviewing a complaint, a court must accept the plaintiff's allegations as true, liberally construing those by a plaintiff proceeding *pro se*, but need not accept as true legal conclusions. *Iqbal*, 556 U.S. at 678.

## III.  Complaint Allegations & Exhibits[1]

Plaintiff acknowledges in his complaint that he received medical care for his initial injury—an impacted wisdom tooth. *See* Compl. at 5. He had surgery on April 9, 2019. *Id. See also* Compl. Ex. B at 2 (March 21, 2019 medical record documenting Plaintiff's pre-surgery evaluation by Dr. Massaro). Plaintiff alleges, and his accompanying medical records confirm, Dr. Massaro nicked Plaintiff's tongue with a dental drill, causing permanent nerve damage and burning/tingling on the left side of his tongue. *See* Compl. at 5-6. *See also* Compl. Ex. B at 11. Plaintiff complains that, after the surgery, he "received no treatment for the extreme and continuous pain and burning throughout the left side of his tongue for more than six (6) months." *See* Compl. at 6. He further

---

[1] In reviewing the facial sufficiency of a complaint, a court may consider extrinsic evidence when a document "is central to the plaintiff's claim" and incorporated by reference in the complaint. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368-69 (11th Cir. 1997).

alleges, "For years, Defendants led [him] to believe that he was being scheduled to be treated, but the Defendants had no intention of treating [him]. Instead, the Defendants withheld treatment from Plaintiff for approximately fifteen (15) months." *Id.* at 7.

Plaintiff's own allegations, grievance records, and medical records belie his assertions that he received no care for six months after the surgery and that care was unnecessarily and intentionally delayed for fifteen months at some later time. For instance, Plaintiff contends in his complaint and in grievances that the dentist at Tomoka Correctional Institution (TCI), Dr. Calcagno, saw him immediately after the surgery and prescribed antibiotics for an infection that appears to have been unrelated to the nerve damage. *Id. See also* Compl. Ex. A at 11. Dr. Calcagno was aware of the nerve damage and told Plaintiff he would need to wait six months to a year to see if it would heal on its own. *See* Compl. at 6. Dr. Calcagno informed Plaintiff the nerve may never heal. *Id. See also* Compl. Ex. A at 11.

Although Dr. Calcagno told Plaintiff he would have to wait at least six months for his tongue to have time to heal on its own, Dr. Calcagno, "continued to place [him] on the call-out [list]" to check the status of his injury. *See* Compl. Ex. A at 11, 13. Indeed, Plaintiff had follow-up or sick-call appointments with

4

Dr. Calcagno on the following dates: September 9, 2019; September 16, 2019; October 1, 2019; and October 8, 2019. *See* Compl. Ex. B at 3.

Plaintiff concedes in his complaint that Dr. Calcagno referred him to the Reception and Medical Center (RMC) to be seen by a specialist. *See* Compl. at 6. He does not say when the referral was made, but based on grievance and medical records, it appears Dr. Calcagno made the referral after monitoring Plaintiff's condition for about six months. *See* Compl. Ex. A at 11, 13; Compl. Ex. B at 3. While Plaintiff was waiting to be seen at RMC, he continued seeing providers at TCI: on January 27, 2020, Dr. Popa noted Plaintiff had been referred to RMC, but the appointment was never scheduled. *See* Compl. Ex. B at 4; Compl. Ex. D at 5. Dr. Popa wrote another referral for Plaintiff to be seen at RMC but told Plaintiff that "possibly nothing can be done for [the issue]." *See* Compl. Ex. B at 4.

Plaintiff continued treating with Dr. Popa while waiting for his RMC appointment, which was delayed because of COVID-19. *See id.* at 4-6. *See also* Compl. Ex. A at 11-12. In grievance responses dated May 12, 2020, and August 19, 2020, Plaintiff was informed, "Due to COVID-19 presently there is no movement on the compound except for emergent care," but he would "be seen when transportation between institutions resumes." *See* Compl. Ex. A at 12, 16. On July 16, 2020, Dr. Popa noted Plaintiff was on the list to be seen at

5

RMC, and on September 9, 2020, Dr. Popa called RMC to have him moved up on the list because Tylenol was providing him no relief. *See* Compl. Ex. B at 6-7.

Plaintiff had an appointment with Dr. D. Smith, an oral and maxillofacial surgeon at RMC, on September 21, 2020. *Id.* at 15, 19. *See also* Compl. Ex. A at 20. The notes regarding the diagnosis and treatment plan are difficult to read, but Dr. Smith noted Plaintiff should return in three months, which he did, on January 1, 2021. *See* Compl. Ex. B at 8, 15, 19. A January 13, 2021 entry by Dr. Popa notes that "RMC . . . could not help [Plaintiff] [with the] burning [of his] tongue." *Id.* at 8. Dr. Smith saw Plaintiff again on March 8, 2021. *Id.* at 9. Again, the notes are difficult to read, but a March 10, 2021 entry by Dr. Popa notes that Plaintiff did "not want to return to RMC" for more appointments. *Id. See also* Compl. Ex. D at 7 (refusal form). Plaintiff alleges in his complaint that Dr. Smith informed him "[he] would have to live with this injury [for] the rest of his life," and he (Dr. Smith) did not recommend Plaintiff attempt a surgical solution (if there was one) while he was in prison. *See* Compl. at 7. On April 5, 2021, Dr. Popa dispensed Ibuprofen for pain. *See* Compl. Ex. B at 10.

On April 20, 2021, and May 10, 2021,[2] Dr. Popa noted Plaintiff had a "chronic condition" for which there was "no cure." *Id.* at 11. Dr. Popa dispensed more Ibuprofen at both appointments. *Id.* Plaintiff returned to Dr. Popa again on June 9, 2021, and on June 10, 2021, Dr. Popa ordered another RMC consult. *Id.* at 12. Plaintiff had another appointment with Dr. Smith at RMC on June 28, 2021. *Id.* The notes are difficult to read, but it appears Dr. Smith recommended that Plaintiff follow-up as needed. *Id.* On July 6, 2021, Dr. Popa evaluated Plaintiff, noting he had a history of nerve damage for which the treatment plan was "pall[i]ative" care. *Id.* at 13. Dr. Popa dispensed more Ibuprofen. *Id.* Plaintiff refused his August 4, 2021 appointment. *Id.* On September 17, 2021, he was seen in sick-call for a "limited evaluation." *Id.*

Plaintiff was seen in sick-call again on October 4, 2021. *Id.* at 16. He failed to show for his scheduled October 6, 2021 appointment with dental because of a security issue. *Id.* He treated with a dental nurse on October 12, 2021, October 27, 2021, November 10, 2021, and December 1, 2021. *Id.* at 17-18. The nurse referred him to an oral surgeon in October. *Id.* at 18. *See also* Compl. Ex. D at 9 (referral for oral surgery consult).

---

[2] For the April 20th appointment, the year is noted to be "2019," but that appears to be a scrivener's error. *See* Compl. Ex. B at 11.

7

On January 10, 2022, Plaintiff was seen at RMC and a request for a neurology consult was submitted for his chronic left tongue paresthesia. *See* Compl. Ex. C at 2-4, 17, 19. It appears he had appointments regularly between January 10, 2022 and July 15, 2022, when another neurology consultation request was submitted by Dr. Asbelti Llorens, along with an order for a brain MRI. *Id.* at 23, 30. Plaintiff had a brain MRI on August 24, 2022, which was largely unremarkable. *Id.* at 32-33. Plaintiff treated with Dr. Iman Naseri at RMC on December 12, 2022. *See* Compl. Ex. D at 12. Dr. Naseri prescribed a trial of triamcinolone oral paste and told Plaintiff to follow-up in two to three months. *Id.* at 13.

## IV.   Deliberate Indifference Standard

A claim for deliberate indifference to a serious illness or injury is cognizable under § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim, a plaintiff first must allege he had a serious medical need. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Next, the plaintiff must "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Finally, the plaintiff must allege facts showing a causal connection between the defendant's conduct and his resulting injuries. *Mann*

*v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care . . . or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). However, "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). To sufficiently plead the second element (deliberate indifference), a plaintiff must do more than allege the care he received was "subpar or different from what [he] want[ed]." *Id.* Rather, "a plaintiff must [allege] that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than *gross* negligence." *Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis in original).

The Eleventh Circuit recently has "been at pains to emphasize" that deliberate indifference is much more stringent a standard than negligence or malpractice: it "is *not* a constitutionalized version of common-law negligence." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (emphasis in original) (quoting *Swain v. Junior*, 961 F.3d 1276, 1287-88 (11th

9

Cir. 2020)). The Eighth Amendment does not mandate that the medical care prisoners receive be "perfect, the best obtainable, or even very good." *Id.* (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991)). As such, allegations that prison medical providers "could be doing more, doing better" do not satisfy the stringent deliberate indifference standard. *Id.* Even a decision by a medical provider that can be classified as "more than *merely* negligent . . . . does not rise to the level of a constitutional violation." *Wade*, 67 F.4th at 1375 (emphasis in original) (concluding a nurse's decision to wait for an inmate's already-ordered epilepsy medication to arrive rather than to retrieve some from the supply closet, while "regrettable," was not more than grossly negligent). *See also Estelle*, 429 U.S. at 106, 107 (holding a prisoner failed to state a plausible claim where he alleged that more should have been done to diagnose his back injury and treat his pain).

When a plaintiff has received some treatment, to plead a deliberate-indifference claim, he must allege facts showing the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Stated another way, "[d]eliberate indifference is not about 'inadvertence or error in good faith,' but rather about 'obduracy and wantonness'—a deliberate refusal to provide aid

10

despite knowledge of a substantial risk of serious harm." *Stone v. Hendry*, 785 F. App'x 763, 769 (11th Cir. 2019)[3] (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

If a plaintiff plausibly alleges a medical provider was deliberately indifferent to his serious medical needs, he must allege more to proceed on a claim against the provider's supervisor or employer because, under § 1983, a claim must be premised on something more than a theory of respondeat superior or vicarious liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). *See also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) ("It is axiomatic, in [§] 1983 actions, that liability must be based on something more than a theory of respondeat superior.").

A claim against a supervisor arises only "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Id.* Absent direct involvement by a supervisor— such as when the supervisor knows a subordinate will act unlawfully or adopts a policy that results in deliberate indifference to inmates' constitutional

---

[3] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

rights—the requisite causal connection "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *See id.*; *Cottone*, 326 F.3d at 1360. A plaintiff relying on the "history of widespread abuse" theory must demonstrate the past deprivations were "obvious, flagrant, rampant and of continued duration," such that the supervising official was on notice of the need to take corrective action. *See Brown*, 906 F.2d at 671.

Similarly, to proceed against a municipality, including a private medical services provider under contract with a municipality,[4] a plaintiff must allege the existence of a "custom or policy that constituted deliberate indifference to [a] constitutional right" and that caused a constitutional violation. *Moody v. City of Delray Beach*, 609 F. App'x 966, 967 (11th Cir. 2015) (citing *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004)). *See also Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that § 1983 applies to municipalities but liability arises only when a "municipal policy of some nature cause[s] a constitutional tort").

---

[4] "[W]hen a private entity ... contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the municipality under [§] 1983." *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (second alteration in original) (internal quotation marks omitted) (quoting *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)).

When a plaintiff premises a claim for supervisory or municipal liability on an unconstitutional-policy theory, his allegations cannot be conclusory. *See Rankin v. Bd. of Regents of the Univ. Sys. of Ga.*, 732 F. App'x 779, 783 (11th Cir. 2018). Instead, a plaintiff must allege facts "show[ing] a persistent and wide-spread practice." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) (quoting *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees." *Craig*, 643 F.3d at 1311. *See also Rankin*, 732 F. App'x at 783 (reasoning that the "claim [against the supervisor] fail[ed] because most of the allegations supporting it [were] conclusory, and to the extent some [were] based on facts, they [were] limited to [the plaintiff's] own experience").

## V.    Analysis

Plaintiff fails to state a plausible deliberate indifference claim against Dr. Massaro. Accepting that Dr. Massaro nicked Plaintiff's tongue, causing permanent damage, including numbness, tingling, and pain, such conduct constitutes mere negligence. Plaintiff himself acknowledges that, in attempting to find a lawyer to represent him, the lawyers he contacted described the claim as one of "medical malpractice." *See* Compl. Ex. E at 13, 17. That Plaintiff suffered a permanent injury appears indisputable and is

regrettable. However, "[a]ccidents, mistakes, negligence, and medical malpractice are not constitutional violation[s] merely because the victim is a prisoner." *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) (second alteration in original) (internal quotation marks omitted) (quoting *Estelle*, 429 U.S. at 106).

Plaintiff's claims against Centurion and the Secretary of the FDC also fail. To the extent Plaintiff's claims against these Defendants are premised on an underlying violation by Dr. Massaro, the claims necessarily fail because he does not state a plausible deliberate indifference claim against Dr. Massaro. "There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)).

To the extent Plaintiff's claims against Centurion and the FDC are based on alleged personal participation through the adoption of policies or customs, he fails to state a plausible claim for relief. Despite Plaintiff's conclusory assertions that treatment for the nerve damage to his tongue was delayed or denied, his allegations and supporting records demonstrate he received consistent medical care, including referrals to specialists. Accepting as true that Plaintiff's initial appointment with a specialist at RMC was not

immediately scheduled when Dr. Calcagno requested the appointment in October 2019, Plaintiff's allegations do not permit the reasonable inference the failure was attributable to an official policy, custom, or practice of Centurion or the FDC. On the contrary, it appears to have been an oversight or error on the part of an unknown and unnamed individual, and, when the oversight was discovered, Dr. Popa submitted another referral. Additionally, Plaintiff alleges no facts demonstrating scheduling errors occurred with such regularity that prison officials were on notice of deprivations that were "obvious, flagrant, rampant and of continued duration." *See Brown*, 906 F.2d at 671. Rather, Plaintiff's allegations regarding delayed medical care revolve around his own experiences. *See Rankin*, 732 F. App'x at 783.

Even if the decision by Centurion or the FDC not to transport inmates for routine medical appointments during the height of the COVID-19 pandemic constitutes an official policy, Plaintiff's allegations do not permit the reasonable inference the policy "constituted deliberate indifference to [a] constitutional right" or caused a constitutional violation. *See Moody*, 609 F. App'x at 967. Plaintiff continued being seen by providers at TCI while he waited for his appointment at RMC. Moreover, Plaintiff himself acknowledges, and his records demonstrate, the injury he sustained is permanent and his treatment options merely palliative, not curative. *See* Compl. at 7-8. *See also*

15

*See* Compl. Ex. B at 11, 13. Thus, any delay in seeing a specialist could not have impact his prognosis or treatment plan.

## VI.   Conclusion

For the reasons stated, Plaintiff fails to state a plausible deliberate indifference claim against the named Defendants, and his complaint is due to be dismissed.

Accordingly, it is

**ORDERED:**

1.      This case is **DISMISSED without prejudice**.

2.      The **Clerk** shall enter judgment dismissing this case without prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of August 2023.

_____
BRIAN J. DAVIS
United States District Judge


Jax-6
c:      Earl James Ray

16